G.F.D. ENTERPRISES, INC. ET AL., APPELLANTS, *v.*
NYE; DOLLAR SAVINGS & TRUST COMPANY ET AL., APPELLEES.

[Cite as G.F.D. Enterprises, Inc. *v.* Nye (1988), 37 Ohio St. 3d 205.]

(No. 87-475—Submitted March 15, 1988—Decided June 22, 1988.)

*Lawrence J. Damore, Robert P. Damore* and *David A. Bobovynik,* for appellants.

*Manchester, Bennett, Powers & Ullman Co., L.P.A.,* and *John F. Zimmerman, Jr.,* for appellee Dollar Savings & Trust Company.

*Westenfield & Neuman* and *Douglas J. Neuman,* for appellee Dollar Savings Bank Company, n.k.a. Security Dollar Bank.

HOLMES, J. The sole issue presented by this case is whether either of the appellee banks herein may be held liable to appellants for accepting for payment at Nye's direction the corporate checks drawn over the unauthorized signatures, or forgeries, of Nye. Because both of these banks took the checks as holders in due course, because appellant G.F.D. Enterprises' own negligence substantially contributed to the making of the unauthorized signatures, and because no warranty action existed between the parties, we answer such query in the negative and affirm the court of appeals' decision.

As noted by the court of appeals, the disposition of this case is governed by the provisions of the Uniform Commercial Code, specifically Articles 3 and 4, R.C. Chapters 1303 and 1304. We cannot agree with appellee Youngstown Dollar that the central issue herein is whether the banks acted negligently by paying these checks according to Nye's personal instructions. As will be seen, that issue becomes relevant only in the absence of negligence on the part of the appellants,[5] and only after the relationships between the various participants in these transactions have been defined with reference to the UCC.

The rather complicated transactions made by Nye present a classic case of embezzlement by negotiable instrument, with which the UCC is amply equipped to deal. "* * * [T]he Uniform Commercial Code is a delicately balanced statutory scheme designed, in principle, to ultimately shift the loss occasioned by negotiation of a forged instrument to the party bearing the responsibility for the loss." *Ed Stinn Chevrolet, Inc.* v. *Natl. City Bank* (1986), 28 Ohio St. 3d 221, 226, 28 OBR 305, 309, 503 N.E. 2d 524, 530, modified on rehearing (1987), 31 Ohio St. 3d 150, 31 OBR 316, 509 N.E. 2d 945. In cases such as the one *sub judice,* the drawee bank is generally strictly liable to its customer-drawer for charging the drawer's account on a forged item which is not properly payable under R.C. 1304.24(A).[6] This result follows from the "final payment" rule, R.C. 1303.54, which provides:

"Except for recovery of bank payments as provided in sections 1304.01 to 1304.34, inclusive, of the Revised Code, and except for liability for breach of warranty on presentment under section 1303.53 of the Revised Code, *payment or acceptance of any instrument is final in favor of a holder in due course,* or a person who has in good faith changed his position in reliance on the payment." (Emphasis added.)

Essentially, final payment by a payor bank renders such bank primarily liable on the instrument. See, also, R.C. 1304.19 (when an item is finally paid by a payor bank); *Ed Stinn*

---

[5] See the discussion concerning R.C. 1303.42 (UCC 3-406), *infra.*

[6] R.C. 1304.24(A) provides:

"As against its customer, a bank may charge against his account any item which is otherwise properly payable from that account even though the charge creates an overdraft."

*Chevrolet, supra,* at 230, 28 OBR at 313, 503 N.E. 2d at 533, and authority cited therein. The rationale for this rule is twofold: first, the drawee is in a superior position, as among other holders, to detect a forgery because it has the drawer's signature and is expected to know and compare it; and, second, it is desirable that transactions should come to an end once an item is paid. Official Comment 1 to R.C. 1303.54; White & Summers, Uniform Commercial Code (2 Ed. 1980) 610, Section 16-2; *Ed Stinn Chevrolet, supra.*

Unlike the situation we faced in *Ed Stinn Chevrolet* which involved an action by a drawer-customer against its drawee bank, our situation today is complicated by the fact that none of the restaurants' drawee banks was made a party to this action and thus the issue of their ultimate liability is not before us.[7] Both appellee banks were a "depository bank," as defined in R.C. 1304.01(A)(12),[8] merely transferring the instruments to the drawees for payment. As such, they were only secondarily liable and were beneficiaries of the final payment rule, provided they took the instruments as a holder in due course. R.C. 1303.54.

R.C. 1303.31 provides, in part:

"(A) A holder in due course is a holder who takes the instrument:

"(1) for value; and

"(2) in good faith; and

"(3) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

"(B) A payee may be a holder in due course."

First, both appellee banks were "holders,"[9] as they were in possession of the checks drawn to their order.[10] Second, each of the checks involved met the requirements of a negotiable instrument. R.C. 1303.01(A)(5) and 1303.03(A). Each of the checks was "signed by the drawer," as required by R.C. 1303.03(A)(1), as they contained the name of Guy Damore or Phyllis Nye — both of whom were listed on the signature cards as authorized signators on behalf of the drawer restaurants. The fact that these signatures were forgeries or were otherwise unauthorized is governed by R.C. 1303.40(A), which provides:

"* * *"

As neither Youngstown Dollar nor Niles Dollar was a payor bank, they were "collecting banks" under these definitions.

---

[7] Niles Dollar's motion to dismiss the action for failure to join the drawee banks was summarily overruled by the trial court. The record indicates, however, that appellants have filed actions against the drawees in other forums.

[8] R.C. 1304.01(A) provides, in pertinent part:

"(12) 'Depository bank' means the first bank to which an item is transferred for collection even though it is also the payor bank;

"(13) 'Payor bank' means a bank by which an item is payable as drawn or accepted;

"* * *

"(15) 'Collecting bank' means any bank handling the item for collection except the payor bank;

[9] R.C. 1301.01(T) provides:

" 'Holder' means a person who is in possession of a document of title or an instrument or an investment security drawn, issued, or indorsed to him or to his order or to bearer or in blank."

[10] Both banks essentially treated the checks involved herein as bearer paper, even though the instruments contained the words "Pay to the order of Dollar Savings" or "Pay to the order of Dollar Bank," usually signifying order paper. See R.C. 1303.09 and Official Comment 2 to R.C. 1303.10.

"Any unauthorized signature is wholly inoperative as that of the person whose name is signed *unless he ratifies it or is precluded from denying it*; but it operates as the signature of the unauthorized signer in favor of any person who in good faith pays the instrument or takes it for value. * * *" (Emphasis added.)

As will be seen, appellants were precluded by their negligence from denying Nye's authority to sign these checks.

Third, both banks took each instrument for "value" when they either credited the amount of the item in a customer's account for withdrawal as of right (following final payment by the drawee), or where the credit given for the item was withdrawn (to purchase money orders) or applied. R.C. 1303.32(A), 1304.14(A), 1304.15, and 1304.19(D).[11]

Fourth, both banks took each instrument in good faith and without notice of any claim or defense against it. No evidence was presented to indicate that either bank failed to act with "honesty in fact" good faith as defined in R.C. 1301.01(S). Where a bank acts honestly, the good faith requirement is met, absent notice of a claim or defense. White & Summers, *supra,* at Section 14-6; 4 Hawkland, Uniform Commercial Code Series (1986) 367-370, Section 3-302:02.[12] The notice requirement is equally narrow. R.C. 1301.01(Y) provides:

---

[11] R.C. 1303.32(A) provides:

"A holder takes the instrument for value:

"(A) to the extent the agreed consideration has been performed or that he acquires a security interest in or a lien on the instrument otherwise than by legal process[.] * * *"

R.C. 1304.14(A) provides:

"(A)  A bank has a security interest in an item and any accompanying documents or the proceeds of either:

"(1)  in case of an item deposited in an account to the extent to which credit given for the item has been withdrawn or applied;

"(2)  in case of an item for which it has given credit available for withdrawal as of right, to the extent of the credit given whether or not the credit is drawn upon and whether or not there is a right of chargeback; or

"(3)  if it makes an advance on or against the item."

R.C. 1304.15 provides:

"For the purposes of determining its status as a holder in due course, the bank has given value to the extent that it has a security interest in an item provided that the bank otherwise complies with the requirements of section 1303.31 of the Revised Code on what constitutes a holder in due course."

R.C. 1304.19(D) provides in part:

"Subject to any right of the bank to apply the credit to an obligation of the customer, credit given by a bank for an item in an account with its customer becomes available for withdrawal as of right:

"(1) in any case where the bank has received a provisional settlement for the item, when such settlement becomes final and the bank has had a reasonable time to learn that the settlement is final[.] * * *"

See, also, White & Summers, *supra,* at Section 14-5.

[12] In drafting the definition of "good faith," "the drafters wrestled with the question of whether the standard adopted for good faith should be objective or subjective. An earlier draft of section 3-302 provided that good faith required 'reasonable observance of the standards of any business or trade in which the purchaser is engaged.' The official draft omitted this requirement on the grounds that it would have too great an inhibiting effect on the free negotiability of commercial paper. The drafters did not want to impose upon the purchaser the risk that a jury, on hindsight, would find that he had not observed the reasonable commercial standards of his trade or profession." 4 Hawkland, *supra,* at 367-368.

"A person has 'notice' of a fact when:

"(1) he has actual knowledge of it; or

"(2) he has received a notice or notification of it; or

"(3) from all the facts and circumstances known to him at the time in question he has reason to know that it exists.

"A person 'knows' or has 'knowledge' of the fact when he has actual knowledge of it. * * *"

The only evidence presented tending to show that the banks here had reason to know of a claim or defense from the surrounding circumstances was that relevant to Nye's authority to negotiate the checks. At most, there was evidence that the banks should have been suspicious of Nye's authority to deposit the sums into her personal accounts. However, the mere arousal of suspicion by the circumstances alone is not sufficient evidence of "knowledge" of a claim or defense. White & Summers, *supra,* at Section 14-6; 4 Hawkland, *supra,* fn. 6 and accompanying text, at 368-370; *Johnson* v. *Way* (1875), 27 Ohio St. 374; *Johnson* v. *Citizens Natl. Bank* (1975), 30 Ill. App. 3d 1066, 334 N.E. 2d 295. No evidence was presented to support any of the indicia of notice enumerated in R.C. 1303.33(A) through (C). Further, R.C. 1303.33 (D)(5) provides that mere knowledge that the person negotiating the instrument stands in the position of a fiduciary is insufficient to give notice.[13] Finally, R.C. 1303.31(B) eliminates any confusion which may have existed under prior law, providing that a payee, such as the payee banks herein, may become a holder in due course under the same circumstances as any other holder. Official Comment 2 to R.C. 1303.31; 2 Bender's Uniform Commercial Code Service, Hart & Willier, Commercial Paper (1972) 11-11, Section 11.02. Thus, we hold that both Youngstown Dollar and Niles Dollar were holders in due course of each of appellant restaurants' misappropriated checks.

R.C. 1303.34 provides:

"To the extent that a holder is a holder in due course he takes the instrument free from:

"(A) all claims to it on the part of any person; and

"(B) all defenses of any party to the instrument with whom the holder has not dealt except:

"(1) infancy, to the extent that it is a defense to a simple contract; and

"(2) such other incapacity, or duress, or illegality of the transaction, as renders the obligation of the party a nullity; and

---

[13] R.C. 1303.33 provides:

"(A) The purchaser has notice of a claim or defense if:

"(1) the instrument is so incomplete, bears such visible evidence of forgery or alteration, or is otherwise so irregular as to call into question its validity, terms, or ownership or to create an ambiguity as to the party to pay; or

"(2) the purchaser has notice that the obligation of any party is voidable in whole or in part, or that all parties have been discharged.

"(B) The purchaser has notice of a claim against the instrument when he has knowledge that a fiduciary has negotiated the instrument in payment of or as security for his own debt or in any transaction for his own benefit or otherwise in breach of duty.

"* * *

"(D) *Knowledge of the following facts does not of itself give the purchaser notice of a defense or claim:*

"* * *

"(5) *that any person negotiating the instrument is or was a fiduciary*[.] * * *" (Emphasis added.)

"(3) such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms; and

"(4) discharge in insolvency proceedings; and

"(5) any other discharge of which the holder has notice when he takes the instrument."

The holder in due course is the most preferred party in R.C. Chapters 1303 and 1304, the "bona fide purchaser" of UCC Article 3. 4 Hawkland, *supra,* at 366, Section 3-302:01. This preferred status was established to encourage the purchase of negotiable instruments, ensuring that the good faith purchaser receive his bargained-for exchange. *Id.*; see, also, Editor's Analysis in Page's Ohio Revised Code Annotated following R.C. 1303.31. The holder in due course takes free of all claims and defenses to the instrument, except the real defenses of R.C. 1303.34(B). Appellants' claim against appellees for negligence must therefore fail due to the appellees' status as holders in due course.

Appellants' negligence claim presents a difficult analysis, as such a claim sounding in tort has its genesis outside the UCC. However, the negligence cause of action is preserved by the Code[14] and once brought, the UCC will govern the rights and liabilities of the parties in such action. Specifically, concerning appellee banks, R.C. 1304.03(A) provides:

"The effect of the provisions of sections 1304.01 to 1304.34, inclusive, of the Revised Code, may be varied by agreement except that *no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care* or can limit the measure of damages for such lack or failure; but the parties may by agreement determine the standards by which such responsibility is to be measured if such standards are not manifestly unreasonable." (Emphasis added.)

Although no provision in the UCC specifically states that a bank is liable for negligently paying an item, the above subsection at least implies that a common-law action may lie when a bank's conduct falls below ordinary care. See 2 Hart & Willier, *supra,* at Section 12.34. In fact, what constitutes ordinary care on the part of a bank is more fully described in subsections (C) and (D) of R.C. 1304.03, which provide:

"(C) Action or non-action approved by sections 1304.01 to 1304.34, inclusive, of the Revised Code, or pursuant to Federal Reserve regulations or operating letters constitutes the exercise of ordinary care and, in the absence of special instructions, action or non-action consistent with clearing house rules and the like or with a general banking usage not disapproved by sections 1304.01 to 1304.34, inclusive, of the Revised Code, prima facie constitutes the exercise of ordinary care.

"(D) The specification or approval of certain procedures by sections 1304.01 to 1304.34, inclusive, of the Revised Code do [*sic*] not constitute disapproval of other procedures which

---

[14] R.C. 1301.03 provides:

"Unless displaced by the particular provisions of Chapters 1301., 1302., 1303., 1304., 1305., 1306., 1307., 1308., and 1309. of the Revised Code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions." (Emphasis added.)

may be reasonable under the circumstances."

Appellants allege that appellee banks failed to exercise ordinary care in endorsing the checks and giving the proceeds thereof to an unauthorized agent of the corporation. They cite to abundant case law from other jurisdictions in support of their cause of action, such as *Bank of So. Md.* v. *Robertson's Crab House, Inc.* (1978), 39 Md. App. 707, 715, 389 A. 2d 388, 393, wherein it was stated:

" 'Where a check is drawn to the order of a bank to which the drawer is not indebted, the bank is authorized to pay the proceeds only to persons specified by the drawer; it takes the risk in treating such a check as payable to bearer and is placed on inquiry as to the authority of the drawer's agent to receive payment.' " See, also, *Sun 'N Sand, Inc.* v. *United California Bank* (1978), 21 Cal. 3d 671, 148 Cal. Rptr. 329, 582 P. 2d 920; *Transamerica Ins. Co.* v. *United Natl. Bank of Oregon* (1976), 276 Ore. 965, 558 P. 2d 328; *Arvada Hardwood Floor Co.* v. *James* (Colo. App. 1981), 638 P. 2d 828.

On the facts presented in this case, however, we find it unnecessary to decide the merits of appellants' cause of action, or to determine whether a collecting bank may be negligent in treating checks made payable to its order as bearer paper. Testimony was presented that such practice was generally used and accepted in the banking community. In any event, we have already held that treating such an instrument as bearer paper, whether negligent or not, does not, without more, constitute bad faith or give the bank actual notice of any claim or defense on the instrument such as would deny the bank holder in due course status. In addition, the lower courts held that appellants had negligently failed to train and supervise Nye and negligently failed to investigate her actions, and that such negligence substantially contributed to the making of the unauthorized signatures by Nye.

R.C. 1303.42 provides:

"Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business."

The causation requirement of this provision should be liberally interpreted: the negligence must simply be found to be a substantial cause of the making of the unauthorized signature. See Official Comment 3 to R.C. 1303.42; *Thompson Maple Products, Inc.* v. *Citizens Natl. Bank of Corry* (1967), 211 Pa. Super. 42, 234 A. 2d 32; 4 Hawkland, *supra,* at Section 3-406: 07. The evidence below demonstrated G.F.D. Enterprises had failed to sufficiently inquire into Nye's past work experiences, and she admitted at trial that she had been caught embezzling from a former employer — but had not been formally charged. See *Commercial Credit Equipment Corp.* v. *First Alabama Bank of Montgomery, N.A.* (C.A.5, 1981), 636 F. 2d 1051 (employer negligent in hiring employee who had defrauded a previous employer). Further, appellees' expert witness, a certified public accountant, testified that the duties of check writing, check reconciliation and posting of ledgers were duties which should be segregated, and that giving one person authority to perform any two of these functions would be "incompatible" with good accounting

standards. Nye performed all three tasks for G.F.D. Enterprises. Several courts have found the failure to segregate such duties constitutes negligence. See, *e.g., K & K Mfg., Inc.* v. *Union Bank* (App. 1981), 129 Ariz. 7, 628 P. 2d 44; *Westport Bank & Trust Co.* v. *Lodge* (1973), 164 Conn. 604, 325 A. 2d 222; *Read* v. *South Carolina Natl. Bank* (1985), 286 S.C. 534, 335 S.E. 2d 359; 4 Hawkland, *supra,* at Section 3-406:12. Other evidence of at least unwise business practices was presented, including permitting the restaurant checks to be made payable to the banks instead of G.F.D. Enterprises, and allowing the checkbooks of the restaurants to be held in the care of unsupervised employees. We hold that such negligence here substantially contributed to the making of the unauthorized signatures by Nye.

Because of their negligence, appellants are precluded from asserting Nye's lack of authority against appellees, who were holders in due course. R.C. 1303.42. Once again, the appellee collecting banks' preferred status is the end of the matter, and no inquiry must be made as to whether the banks failed to follow reasonable commercial standards in paying the instruments. The express language of R.C. 1303.42 provides that only a drawee or other payor must pay in good faith and in accordance with reasonable commercial standards to benefit from the preclusion; holders in due course are not thus restricted. The statutes make no distinction between holders in due course who are collecting banks and other holders in due course. 2 State of New York, Report of the Law Revision Commission: Study of the Uniform Commercial Code (1955) 1012-1013; 4 Hawkland, *supra,* at Section 3-406:04; cf. Hart & Willier, *supra,* Section 12.35, at 12-236. We may not second-guess the wisdom of the legislature in this regard, and need not reconsider the lower courts' findings that neither appellee bank was negligent. Thus, we hold that appellants, by their negligence in hiring and supervising Phyllis Nye, which substantially contributed to her making unauthorized signatures on corporate checks, are precluded from asserting such lack of authority against either Youngstown Dollar or Niles Dollar, both of which were holders in due course.

Appellants pose an additional argument based on R.C. 1304.29[15]: that even if they were negligent in ex-

---

[15] R.C. 1304.29 provides, in part:

"(A) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.

"(B) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by division (A) of this section, the customer is precluded from asserting against the bank:

"(1) his unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; and

"(2) an unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was [*sic*] available to the customer for a reasonable period not exceeding fourteen calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.

"(C) the preclusion under division (B)

amining the checks returned to them for unauthorized signatures, they, as customers of Youngstown Dollar, are not precluded from asserting the unauthorized signatures if they establish negligence on the part of Youngstown Dollar in paying the items. We disagree, as R.C. 1304.29 is inapplicable to the facts presented herein. That statute applies only to payor banks as drawees and their depositary account customers, as drawers, who are parties to the account contract. 2A Hart & Willier, *supra,* at Section 14.11; 6 Hawkland, *supra,* at 511, Section 4-406:09. The only checks containing unauthorized signatures herein were checks drawn on the non-party payor banks. None of the checks drawn on G.F.D. Enterprises' account with Youngstown Dollar was misappropriated. See fn. 1, *supra.* For the purposes of these transactions, Youngstown Dollar was a collecting bank, which held no depositary contract with the appellant restaurant-drawers, *and sent no bank statements to any of the appellants containing any of the unauthorized cancelled checks.* The mechanism of R.C. 1304.29 cannot apply in these circumstances. G.F.D. Enterprises' other account with Youngstown Dollar is simply irrelevant to this case. Appellants' argument, in this regard, is without merit.

Finally, appellants essentially contend that the appellee banks breached their warranties given pursuant to R.C. 1304.13.[16] That section provides, in pertinent part:

"(A)  Each customer or collecting bank who obtains payment or acceptance of an item and each prior customer and collecting bank *warrants to the payor bank or other payor* who in good faith pays or accepts the item that:

"(1)  he has a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title; and

"(2)  he has no knowledge that the signature of the maker or drawer is unauthorized, except that this warranty is not given by any customer or collecting bank that is a holder in due course and acts in good faith;
"* * *

"(b)  to a drawer with respect to the drawer's own signature, whether or not the drawer is also the drawee; or
"* * *

"(3)  the item has not been materially altered, except that this warranty is not given by any customer or collecting bank that is a holder in due course and acts in good faith;
"* * *

"(b)  to the drawer of a draft, whether or not the drawer is also the drawee;
"* * *

"(B)  Each customer and collecting bank who transfers an item and receives a settlement or other consideration for it *warrants to his*

---

of this section does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item.
"* * *

"(E)  If under this section a payor bank has a valid defense against a claim of a customer upon or resulting from payment of an item and waives or fails upon request to assert the defense, the bank may not assert against any collecting bank or other prior party presenting or transferring the item a

claim based upon the unauthorized signature or alteration giving rise to the customer's claim.* * *"

[16] Whenever, as here, the party giving the warranty is covered by both R.C. 1303.53 warranties and those of 1304.13, the provisions of R.C. Chapter 1304 (which are broader) control. R.C. 1304.02(A); 4 Hawkland, *supra,* at Section 3-417:01.

*transferee and to any subsequent collecting bank* who takes the item in good faith that:

"(1) he has a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title and the transfer is otherwise rightful; and

"(2) all signatures are genuine or authorized; and

"(3) the item has not been materially altered; and

"(4) no defense of any party is good against him; and

"(5) he has no knowledge of any insolvency proceeding instituted with respect to the maker or acceptor or the drawer of an unaccepted item. In addition each customer and collecting bank so transferring an item and receiving a settlement or other consideration engages that upon dishonor and any necessary notice of dishonor and protest he will take up the item." (Emphasis added.)

A close examination of these warranty provisions reveals that neither presentment warranties nor transfer warranties extend from collecting banks to drawers under circumstances similar to those facing us today. The only presentment warranty given by a collecting bank that is a holder in due course, as here, is the warranty of good title. R.C. 1304.13(A)(1). This warranty, however, is given only "to the payor bank or other payor." Appellants, as the drawers of these drafts, can not be considered an "other payor" under the UCC unless they themselves paid the instruments, rather than their drawee. This warranty does not extend to drawers because the drafters of the Code intended that the drawer should sue his drawee bank for improper payment, R.C. 1304.24, since the drawee bank, as mentioned above, is in a better position to raise any defense, such as negligence, against the drawer than is a collecting bank. White & Summers, *supra,* at 602, Section 15-5; 5 Hawkland, *supra,* at 442, Section 4-207:06. Similarly, the transfer warranties of R.C. 1304.13(B) extend only to the collecting bank's immediate transferee "and to any subsequent collecting bank," not to drawers such as appellants. Although the trial court failed to correctly interpret these warranty provisions, its judgment in favor of appellees on the warranty claims was correct.

For all the foregoing reasons, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

MOYER, C.J., SWEENEY, LOCHER, WRIGHT and H. BROWN, JJ., concur.

DOUGLAS, J., concurs in judgment only.